**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| ADP, INC., | ) | |
| | ) | CA No. 07-486 S |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| TODD HUNZEKER CHEVROLET, | ) | |
| OLDS, BUICK, INC., and | ) | |
| TODD HUNZEKER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE DEFAULT**

Now come Defendants, by and through counsel of record, and hereby move the Court to set aside the entry of clerk's default entered on February 25, 2008, and allow Defendants to file a late response to Plaintiff's Complaint.

## I. FACTUAL BACKGROUND[1]

Todd Hunzeker is the President of Todd Hunzeker Chevrolet, Olds, Buick, Inc., which is located in Soda Springs, Idaho. These operations consist of two automobile sales lots. Mr. Hunzeker has many responsibilities in running these operations. These include working all car deals, managing over 40 employees, strategic marketing, financial oversight, and a plethora of other tasks.

[1]The facts contained in this section are found in the Affidavit of Todd Hunzeker in Support of Defendants' Memorandum of Law in Support of Motion to Vacate Default.

At the beginning of the year in 2006, Todd Hunzeker entered into contractual negotiations with BZ Results. BZ Results held itself out as a company which specializes in creating car dealer websites and training those car dealerships to use web-based marketing to increase sales and exposure. During negotiations, BZ Results promised to bring a team of people to Soda Springs, Idaho to train Hunzeker's employees on use of the BZ Results products and to provide specific training for Hunzeker's service, parts and sales departments so his stores could become internet driven. This training program was referred to as a "boot camp." Hunzeker emphasized to BZ Results that the reason he was interested in their products was because he knew nothing about internet-based marketing and wanted enough exposure on the internet so when a potential customer made a web search to buy a vehicle in Idaho, a link to his store's website would appear.

At the beginning of April, 2006, Hunzeker and BZ Results entered into a contract for various products. Under the contract, Hunzeker was required, among other things, to pay approximately $5,300 per month for 36 months for those services. At about the same time, Mr. Wolfington sold BZ Results to ADP, Inc. After that time, Defendants felt like BZ Results did not pay attention to servicing their contract. Defendants did everything BZ Results asked them to do to take advantage of BZ Results' products. They hired a full-time internet manager and provided the internet manager with an office and a computer system. They also changed their company's marketing approach by taking steps to drive customers and potential customers to his website. This included adding the company's internet address to advertising and letterhead, as well as holding contests throughout his marketing area which gave potential customers the opportunity to win prizes if they provided Defendants with their e-mail addresses.

Through the entire first year of the contract, Defendants made payments on time in the amount of approximately $63,000. Despite that fact, Hunzeker had significant difficulty finding his store's website on the internet when he would do sample searches. As a result, Hunzeker called BZ Results approximately a dozen times during the first year to complain about these problems. In addition, his internet manager e-mailed BZ Results constantly expressing the same frustrations. In the late spring of 2007, Hunzeker told BZ Results that if they did not start paying attention to his contract, he would quit paying. He again told BZ Results about the difficulties he was having finding his own store on the internet.

Because things did not improve, Hunzeker carried through with his threat and quit paying on the contract. He also filed a complaint with the Rhode Island Better Business Bureau in July, 2007. He also spoke to Mr. Wolfington, who still worked for BZ Results, and he was directed to another BZ Results employee. This employee told Hunzeker that the problem was Hunzeker did not have a search engine optimization tool. This was contrary to the original contract, since he had been assured that through the products he purchased via the original contract, Defendants had everything in place for a successful web-based operation.

BZ Results assured Hunzeker that with the search engine optimization tool, everything would work properly. BZ Results sent Hunzeker a second contract and asked him to sign and send it back. When Hunzeker received the contract, he read it and found it increased his rates by $1,000 per month. He called BZ Results and told them he would not sign the contract because he did not feel it was right that BZ Results was asking him to pay an additional $1,000 per month for services they had already agreed to provide.

BZ Results and Hunzeker began to discuss how to part ways and terminate the contract. BZ Results wanted additional money, and Hunzeker felt his previous payments

should be returned since BZ Results did not fulfill their contractual obligations. Specifically, BZ Results did not provide the "boot camp" training it promised. The most BZ Results had done was send one employee to Soda Springs to talk to the sales department for a couple of hours, but the BZ Results employee provided no real training. These discussions continued through the end of 2007.

On January 8, 2008, Defendants were served with a Summons and Complaint. They also received, by certified mail, Plaintiff's applications for default. During this same time period, Hunzeker was continuing discussions with BZ Results about settlement and was under the impression that those negotiations would be successful. As a result, he believed BZ Results would not continue to pursue the lawsuit. In addition, he continued to operate his car dealerships, supervise his employees, and carry out all of the duties for which he had responsibility. Also during this same time period, Hunzeker was dealing with a family member who had an illness. The illness required specialized treatment in Arizona from January, 2008, through late spring.

When Defendants received the request for default judgment in early June, 2008, they contacted counsel and asked for representation, realizing at that point BZ Results was continuing to pursue the lawsuit, that settlement negotiations were not going to be successful, and that they needed to protect their interests. The reason Defendants did not appreciate that BZ Results was pursuing the lawsuit prior to this time was that they felt there was no way BZ Results, in good conscience, would appear before a court and ask for additional payment when Defendants had already paid well over $60,000 and received virtually nothing in return. Hunzeker was not able to locate his own store on the internet, his employees were not properly trained, and BZ Results failed in other respects to fulfill their obligations under the contract.

## II. ARGUMENT

A decision on whether to set aside an entry of default under Federal Rule of Civil Procedure 55(c) is within the sound discretion of the district court. Coon v. Grenier, 867 F.2d 73, 75 (1st Cir., 1989). The standard to be applied under Rule 55(c) is "good cause." Id. "Good cause" is an extremely variable standard which changes from situation to situation. Id., 867 F.2d at 76. It is also a liberal standard, which is more easily overcome than the Federal Rule of Civil Procedure 60(b) standard. Id. "Allowing an entry of default to be set aside on a showing of reasonable justification is in keeping both with the philosophy that actions should ordinarily be resolved on their merits and with the command of the Civil Rules themselves." Id. (internal citations omitted).

The liberal approach is appropriate when considering whether to set aside a default because it is early in the case and least likely to cause unfair prejudice to the non-moving party or to disrupt the Court's calendar. Id. The First Circuit has also determined that when considering motions to set aside default under Rule 55(c), "a district court should resolve doubts in favor of a party seeking relief from the entry of a default." Id.

In the Coon case (cited above), the First Circuit identified seven different factors that are all relevant to the determination as to whether good cause exists to set aside a default: (1) whether the default was willful, (2) whether setting it aside would prejudice the adversary, (3) whether the defaulting party presents a meritorious defense, (4) the explanation for the default, (5) the good faith conduct of the parties, (6) the amount in controversy and (7) the timing of the motion. Id. There is no rigid formula for applying all of these factors. Leshore v. County of Worcester, 945 F.2d 471, 472 (1st Cir., 1991).

### A. Justification for the Default

Three of the Coon considerations relate to whether the defendant has offered an adequate justification for its default. Lucerne Farms v. Baling Technologies, Inc., 208 F.R.D. 463, 465 (D. Maine 2002). For ease of analysis, Defendants will present those three factors – the explanation for the default, whether the default was willful, and whether the defaulting party acted in good faith – as a group. Id.

#### 1. Explanation for the Default

Defendants' failure to timely file a response to Plaintiff's Complaint was motivated, in part, by their belief that BZ Results was in earnest pursuing settlement in lieu of litigation. Until Defendants received a copy of Plaintiff's request for default judgment, they were not represented by any counsel in this matter and were making decisions on how to proceed to resolve the dispute without the advice of an attorney. While they may be criticized for failing to seek proper counsel, the absence of such counsel certainly explains why they failed to take the action necessary to avoid the entry of a clerk's default. While the Court certainly cannot condone such inattentiveness with respect to the Federal Rules of Civil Procedure, it may excuse a person's carelessness toward the rules where there is no evidence that the default was caused by willful conduct on the part of the defaulted party. Lucerne, 208 F.R.D. at 465 (setting aside default against New York attorney in a case being litigated in Maine where New York attorney failed to learn about and adhere to the procedures of the Maine Court and instead proceeded as though the procedures applicable in New York governed the case, thereby resulting in a default). This is especially applicable where a person and/or entity is not represented by an attorney and thus fails to understand the significance of the Federal Rules of Civil Procedure and the importance of adhering to deadlines, as in this case before the court.

Defendants' failure to timely file may also be explained by Hunzker's professional responsibilities in running two stores, as well as the personal matters with which he was dealing at the time he was obligated to file a response to Plaintiff's Complaint. The case at hand is similar to the situation found in Leshore, 945 F.2d at 472, Supra. In that case, the First Circuit affirmed the lower court's decision to remove the default in a case against the County of Worcester where the county's reason for not filing a timely response to the plaintiff's complaint was that the county's attorney was sick. Id. The county was served on May 18, 1989, but did not answer. On October 31, 1989, a notice of default was issued against the county. Id. On February 7, 1990, the plaintiff moved for a default judgment and the county then responded by moving to remove the default. Id. The proffered reason for late filing was that the county attorney had been ill, and the lower court accepted this as an appropriate reason in deciding to set aside the default. Id. In affirming the lower court, the First Circuit considered the importance of resolving cases on their merits and resolving doubts in favor of a party seeking relief from an entry of a default. Id.

While Hunzeker's reasons for not filing timely are no more compelling than the reason provided by the county in the Leshore case, the First Circuit accepted the county's explanation. Id. Defendants urge this Court, likewise, to accept their explanation for untimely filing and allow the parties to move forward in resolving their dispute on the merits.

**2. Willfulness**

Courts tend to view a default as "willful" in nature when the defaulted party's conduct shows contempt for the court's procedures or an effort to evade the court's authority. Coon, 867 F.2d at 76. There is no suggestion in this case that Defendants' actions were willful in either sense. They did not try to evade the Court's authority and,

while it may be said they did not appreciate the Court's procedures, they certainly did not show contempt for them. In fact, once Defendants realized the litigation was in fact continuing, they immediately contacted an attorney to ensure that their interests would be protected and that the Court's deadlines were met.

**3. Good Faith**

There is no indication in this case that Defendants were acting in bad faith. They wrongly, but in good faith, believed the lawsuit was on hold while they continued to negotiate a potential settlement with Plaintiff. Once they realized this was not the case, they immediately took the necessary steps to participate in and/or reply to the lawsuit. Given the fact that Defendants were not represented at the time and were not receiving legal advice, their actions – while not proper – can better be accepted as taking place in good faith, especially in light of the backdrop of ongoing settlement negotiations.

**4. Merits of Proffered Defense**

Even where there is a basis to enter default against a party for failing to timely file an answer, courts will not set an entry of default aside unless it appears the defaulting party might prevail if the case were allowed to proceed on the merits. (i.e., the defaulting party has a meritorious defense). Lucerne, 208 F.R.D. at 466. In this case, it should first be noted that Plaintiff has presented no evidence to support personal jurisdiction over Defendants in Rhode Island. Furthermore, as explained above, Plaintiff has failed to comply with its obligations under the contract between the parties and is, therefore, a breaching party itself, subject to a counterclaim. Defendants did not receive the training and assistance Plaintiff promised to provide under the contract. Plaintiff's representations were not honored or realized. The plaintiff's own breach of contract certainly gives rise to a meritorious defense and a possible counter claim.

**5. Prejudice to Plaintiff**

Plaintiff will not be prejudiced should the default be vacated. At most, Plaintiff will suffer a delay in the proceedings; however, a delay alone does not constitute prejudice unless the non-defaulting party suffers some other disadvantage such as the death of material witnesses, loss of evidence, dimming of memories beyond recovery, or the thwarting of a discovery scheme. Coon, 867 F.2d at 77. Plaintiff has presented no such evidence and would not be prejudiced as a result of any removal of the default.

**6. Timing of Motion to Set Aside Default**

Defendants sought legal counsel just as soon as they received a copy of Plaintiff's application for default judgment. This helped to minimize any further delay in the case. This factor operates significantly in Defendants' favor as it demonstrates the Defendants' willingness to contest the compliant and allegations brought by the Plaintiff.

**7. Amount in Controversy**

Finally, in its Complaint, Plaintiff claims Defendants owe it close to $200,000. This is a significant amount of money, which works in favor of resolving the dispute on the merits. Lucerne, 208 F.R.D. at 467. In essence, the Plaintiff should not be entitled to a significant "windfall" by virtue of an untimely answer to its complaint.

## III. CONCLUSION

For the reasons stated above, as well as those arguments raised at the hearing of this motion, the Defendants ask this Court to vacate the default against them.

TODD HUNZEKER CHEVROLET,
OLDS, BUICK, INC., and
TODD HUNZEKER,

By Their Attorneys,

/s/StevenJ. DeLuca
Steven J. DeLuca, Esq., #4192
Sullivan Signore Whitehead & DeLuca, LLP
86 Weybosset Street, Suite 400
Providence, RI 02903
Tel: (401) 861-9900
Fax: (401) 861-9977

/s/ James D. Ruchti
James D. Ruchti, Idaho ISB #6366
Cooper & Larsen
151 N. 3rd Ave., Suite 210
Pocatello, ID 83205
Tel: (208) 235-1145
Fax: (208) 235-1182
(Mr. Ruchti to seek Admission Pro Hac Vice)

**CERTIFICATION**

I hereby certify that on this 30th day of June, 2008, a true copy of the foregoing was e-mailed via ECF to Robin L. Main, Esq. and Jeffrey A. Mega, Esq., Hinckley Allen & Snyder, LLP, 50 Kennedy Plaza, Suite 1500, Providence, RI 02903.

/s/ Steven J. De Luca